[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1176 
Paul Carter and Wendy Carter sued Innisfree Hotel, Inc. ("Innisfree"); Birmingham Civic Center Hotel, d/b/a Travelodge; Travelodge Motels and Motor Hotels; Forte Hotels, Inc.; and Eagle Security, Inc., alleging various claims arising out of an alleged "peeping Tom" incident during their stay at the Birmingham Civic Center Travelodge hotel. The trial court entered a summary judgment in favor of all defendants. The Carters appeal from the summary judgment as it relates to Innisfree.
On a motion for summary judgment, the burden is initially on the movant to make a prima facie showing that there is no genuine issue of material fact (i.e., that there is no dispute as to any material fact) and that the movant is entitled to a judgment as a matter of law. Rule 56, Ala.R.Civ.P.;McClendon v. Mountain Top Indoor Flea Market, Inc.,601 So.2d 957 (Ala. 1992); Elgin v. Alfa Corp., 598 So.2d 807 (Ala. 1992). "The burden does not shift to the opposing party to establish a genuine issue of material fact until the moving party has made a prima facie showing that there is no such issue of material fact." McClendon, at 958; Elgin, at 810-11.
Rule 56 must be read in conjunction with the "substantial evidence rule," *Page 1177 
§ 12-21-12, Ala. Code 1975, for actions filed after June 11, 1987. See Bass v. SouthTrust Bank of Baldwin County,538 So.2d 794, 797-98 (Ala. 1989). In order to defeat a defendant's properly supported motion for summary judgment, the plaintiff must present substantial evidence, i.e., "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co.of Florida, 547 So.2d 870, 871 (Ala. 1989). On review of a summary judgment, this Court considers the record in a light most favorable to the nonmovant and it resolves all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods ofAlabama, Inc., 613 So.2d 359 (Ala. 1993).
The record, viewed in a light most favorable to the Carters,Wilma Corp., supra, suggests the following facts:
On February 25, 1993, the Carters traveled from their home in Huntsville to attend a concert that evening at the Birmingham Civic Center. They planned to spend the night in Birmingham after the concert. Because they were unfamiliar with the Birmingham area, they drove around the area near the Civic Center to locate a hotel convenient to that location. Being familiar with the "Travelodge" name, the Carters decided to rent a room for the night at the Birmingham Civic Center Travelodge.[1] They checked into Room 221 that afternoon, and, after purchasing fast food, went back to their room to eat and relax. While in the room, they heard knocking and scratching sounds, which appeared to emanate from behind a wall near the bathroom; the wall was covered by a mirror. However, they assumed that the sounds were from a neighboring room. The Carters conducted their private marital activities that afternoon, including sexual intercourse, without regard to the strange noises. Wendy was undressed in front of the mirror for nearly two hours that afternoon, while applying her makeup and fixing her hair in preparation for the concert. Before the concert, while Paul was brushing his teeth in front of the mirror, he noticed two scratches in the mirror at eye level. He did nothing about the scratches at that time. The Carters went to the concert as they had planned.
After the concert, Paul again looked into the mirror and saw the scratches. He then removed the mirror and found two round, dime-sized scratches on the back of the mirror. Wendy later described the view through the mirror as "like looking through regular glass with the back gone." Upon closer inspection, Paul found a large hole in the wall behind where the scratches were placed on the mirror. There was a hollow space approximately 1.5 feet wide between the Carters' wall and the wall of the adjoining room, which allows for maintenance workers to repair wiring and plumbing pipes. After looking at the hole closely, the Carters noticed a hole in the wall of the adjoining room that was covered by the mirror in that room. There was black electrical tape stuck onto the mirror of the other room; when Wendy pulled the tape off, the Carters discovered scratches on that mirror as well.
Believing that someone had spied on them through the mirror, Paul walked down to the registration desk to complain and to request a refund. Paul asked the person behind the desk whether he could use her telephone to call the police; she allegedly told him, "[T]here's a pay phone around the corner," and refused to allow him to use the office telephone. Paul said a hotel security guard at the desk told him, "[O]kay, boss man, just go back up to your room. Don't worry about it." The guard then accompanied Paul back to the room. According to Paul, after seeing the holes, "[the guard] said it was nothing. That's all he kept saying. He was the one that was acting the strangest out of all of them." Paul then telephoned the police and asked them to investigate; they were not able to identify the alleged "peeping Tom." After the police and several maintenance workers left, the Carters checked out of the hotel and drove back to Huntsville. Paul testified that he has suffered chronic nervousness and sleeplessness since the incident. *Page 1178 
Wendy testified that she and Paul have had strains in their marriage resulting from nervousness and paranoia she has suffered due to the incident.
Innisfree, a management corporation, manages the Travelodge hotel pursuant to a contract with Merchants Bank of Kansas City, the owner of the hotel. Innisfree contracts with a security personnel company to provide security for the premises. Nora Ward, a manager employed by Innisfree, later found scratches on the mirrors of 13 other rooms at the hotel; 6 other rooms had holes cut into the wall behind the mirror, similar to the hole in Room 221. She testified that her investigation revealed that the holes had been cut to facilitate the servicing of cable wiring. Ward also testified that access into the maintenance space between the rooms may be gained only by cutting a hole into the wall; this is not disputed by the Carters. However, Ward admitted that the mirrors in the Carters' room and the adjoining room could be removed for viewing from one room into the other through the holes and scratches. This is contradictory to Ward's statement in an earlier affidavit that one could not have looked into Room 221 from the adjoining room; in that affidavit Ward stated that the scratches on the mirror in Room 221 were not in alignment with the hole. Although Ward stated that she inspects the Travelodge's rooms on a daily basis, she testified that she did not know of the holes and scratches until the Carters complained about them.
The Travelodge customer who rented the adjoining room during the Carters' stay testified that he did not spy on the Carters. However, the record does not indicate whether he was absent from his room during the time the noises occurred. The record indicates that security guards, maintenance workers, housekeepers, and management personnel employed by Innisfree all have access to master keys that open the hotel rooms.
The Carters contend that the trial court erred in entering a summary judgment in favor of Innisfree on their claims of invasion of privacy, breach of contract, negligence, outrage, and fraud.
 Invasion of Privacy
This Court defines the tort of invasion of privacy as the intentional wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.Nipper v. Variety Wholesalers, Inc., 638 So.2d 778 (Ala. 1994);Phillips v. Smalley Maintenance Services, Inc., 435 So.2d 705
(Ala. 1983); Alabama Electric Co-operative, Inc. v. Partridge,284 Ala. 442, 225 So.2d 848 (1969). One may invade another's privacy through either an intrusion upon a physical space, such as a trespass, or by an invasion of one's "emotional sanctum"; the law prohibits a wrongful intrusion into either of these areas of privacy. Phillips, supra. In defining the invasion of privacy tort, the Phillips Court quoted comment b toRestatement (Second) of Torts § 652B (1977):
 "The invasion may be physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objection in entering his home. It may also be use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs window with binoculars or tapping his telephone wires. It may be by some other form of investigation or examination into his private concerns. . . ."
Phillips, 435 So.2d 705, 710-11 (Ala. 1983).
After reviewing the evidence, we conclude that a jury could reasonably find that the Carters' privacy had been intruded upon by Innisfree; therefore, the summary judgment was inappropriate on the Carters' invasion of privacy claim.
As stated above, the bumping and scratching sounds came from behind the wall where the mirror was stationed. The Carters both testified that the scratches were arranged so as to fit over the hole. The hole in the adjoining room was located directly opposite the hole in Room 221; scratches were found on that mirror as well, covered with electrical tape. The Carters do not dispute Innisfree's *Page 1179 
contention that the maintenance space between the two walls may be accessed only through cutting a hole in the wall; apparently, there are no doors leading into the space. However, testimony of the customer who had rented the adjoining room left open the question whether he was actually in that room while the Carters were hearing the noises from behind their wall. Holes and similarly scratched mirrors were found in several other hotel rooms. The evidence regarding the abundance of opportunity for agents of Innisfree to use master keys to enter the hotel rooms, combined with the evidence of other circumstances set out above, makes the question whether an agent of Innisfree spied on the Carters one of fact, not of law.
We further note that Innisfree maintains that "[p]roof that someone had invaded the Carters' privacy is a prerequisite for recovery." It contends that, because the Carters did not actually see someone behind the wall and had only a suspicion that someone was watching them, there was no such proof. We disagree. Because the scratched mirror and the hole in the wall of Room 221 gave a secret viewing access into Room 221 from the adjoining room, a jury could find a wrongful intrusion into the Carters' right to privacy, and a jury could reasonably infer that the intrusion arose through the actions of Innisfree's agents, who have control over the hotel. The Carters need not prove the actual identity of the "peeping Tom," nor need they demonstrate actual use of the spying device, although, as we have already stated, a jury could reasonably infer from the evidence that the mirror and hole had been used to spy on them. There is no need for the Carters to establish that they saw another's eyes peering back at them through their mirror. Although the absence of proof that anyone used the scratches for spying may be relevant to the question of the amount of damages to which the Carters would be entitled, it is not fatal to their case. See Hamberger v. Eastman, 106 N.H. 107,206 A.2d 239 (1964) (holding that the secret installation of a listening device in another's home is an invasion of privacy, without regard to whether it was actually utilized); Harkey v. Abate,131 Mich. App. 177, 346 N.W.2d 74 (1984) (holding that the secret installation of hidden viewing devices in a public skating rink bathroom is an invasion of privacy, without regard to whether they were actually utilized). There can be no doubt that the possible intrusion of foreign eyes into the private seclusion of a customer's hotel room is an invasion of that customer's privacy, as such an invasion is defined in Phillips, supra.
Even if it is proven that a third party, someone other than an agent of Innisfree, caused the holes and scratches, Innisfree may be held liable for the invasion of the Carters' privacy. It had " 'an affirmative duty, stemming from a guest's rights of privacy and peaceful possession, not to allow unregistered and unauthorized third parties to gain access to the rooms of its guests.' " Thetford v. City of Clanton,605 So.2d 835, 838 (Ala. 1992), quoting Campbell v. Womack,345 So.2d 96, 98 (La.Ct.App.), cert. denied, 347 So.2d 247 (La. 1977).
 Negligence/Breach of Contract
When a hotel rents a room to a paying customer, it undertakes a contractual obligation to that customer to provide a safe, private room. This Court has stated the following principles:
 " 'One of the things which a guest for hire at a public inn has the right to insist upon is respectful and decent treatment at the hands of the innkeeper and his servants. That is an essential part of the contract whether it is express or implied. This right of the guest necessarily implies an obligation on the part of the innkeeper that neither he nor his servants will abuse or insult the guest, or indulge in any conduct or speech that may unnecessarily bring upon him physical discomfort or distress of mind.' "
Dixon v. Hotel Tutwiler Operating Co., 214 Ala. 396, 108 So. 26
(1926) (quoting De Wolf v. Ford, 193 N.Y. 397, 403,86 N.E. 527, 530 (1908)); see also Florence Hotel Co. v. Bumpus,194 Ala. 69, 69 So. 566 (1915); James v. Governor's House, Inc.,284 Ala. 404, 225 So.2d 815 (1969). The proprietor of a hotel may be held responsible if he or his servant *Page 1180 
unjustifiably or unreasonably interferes with a guest's right to privacy and to the peaceful enjoyment of the guest's room.Thetford v. City of Clanton, supra. As stated above, the proprietor of a hotel may also be held liable for the actions of a third party.
 "[A] proprietor is liable for injuries to guests or patrons caused by accidental, negligent, or intentionally harmful acts of other guests, patrons, or third persons, if, by the exercise of reasonable diligence, he could have discovered that such acts were being done or were about to be done and could have protected his guests or patrons by controlling the conduct of the tortfeasor or by giving adequate warning to enable the guest to avoid harm."
40 Am.Jur.2d Hotels, Motels, and Restaurants § 111 (1968).
A jury could reasonably conclude from the evidence that Innisfree, through reasonable inspections, could have prevented the scratched mirrors and the holes behind those mirrors. Although Ward testified that she inspected the rooms daily, there was no evidence to show that inspections had been made for the purpose of looking for scratched mirrors, holes in the wall, or any other possible artificial opening through which one could spy on the hotel rooms. As noted above, following the incident, holes were found behind the mirrors of 6 other rooms. Thirteen mirrors were found to have been scratched. The jury could conclude that Innisfree had a contractual obligation to the Carters, its customers, to provide them with security, which, at the least, would mean a room free from fear that they were being viewed through their mirror. The jury could also find that Innisfree negligently failed to fulfill this duty, by allowing viewing access into the Carters' room through its failure to inspect the wall and to replace the scratched mirror. The trial court erred in entering the summary judgment for Innisfree on these claims.
 Fraud/Outrage
"Fraud" is defined in Ala. Code 1975, § 6-5-101:
 "Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud."
Fraud, as defined by § 6-5-101, includes four elements: (1) There must be a false representation; (2) the false representation must concern a material existing fact; (3) the plaintiff must rely upon the false representation; and (4) the plaintiff must be damaged as a proximate result. Harmon v.Motors Ins. Corp., 493 So.2d 1370, 1373 (Ala. 1986); CrowneInvestments, Inc. v. Bryant, 638 So.2d 873 (Ala. 1994).
The tort of outrage requires extreme and outrageous conduct by a person who intentionally or recklessly causes severe emotional distress to another. American Road Service Co. v.Inmon, 394 So.2d 361 (Ala. 1980). The plaintiff must produce sufficient evidence to show that the defendant's conduct is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."American Road Service Co. v. Inmon, 394 So.2d at 365; see alsoFitch v. Voit, 624 So.2d 542 (Ala. 1993).
We hold that the Carters failed to submit substantial evidence to defeat Innisfree's prima facie showing that no genuine issue of material fact existed as to their outrage and fraud claims; therefore, the trial court properly entered a summary judgment for Innisfree on those claims.McClendon supra; Elgin, supra. The circumstances of this case do not lend themselves to a finding that agents of Innisfree made a misrepresentation to the Carters; without a misrepresentation, the fraud claim must fail. Ala. Code 1975, §6-5-101; Harmon, supra. Further, we decline to hold that the facts of this case meet the stringent standards proclaimed inAmerican Road Service Co., supra, regarding the tort of outrage. See Nabors v. St. Paul Ins. Co., 489 So.2d 573 (Ala. 1986). *Page 1181 
The judgment in favor of Innisfree is affirmed as to the Carters' claims of fraud and outrage. However, that judgment is reversed as to the Carters' claims of invasion of privacy, breach of contract, and negligence.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
ALMON, SHORES, HOUSTON, and BUTTS, JJ., concur.
[1] This Travelodge hotel has since been renamed the "Civic Center Inn." It is still managed by Innisfree.
 *Page 227